Richard E. BUTLER, Sr. and Mrs. Jessie
Simon Butler, Plaintiffs,

George A. Brancato, Plaintiff,

Daniel V. Orsak, Plaintiff,

Mrs. Clara Louise Scott, wife of Joseph
Guy Krebs and Joseph Guy
Krebs, Plaintiffs,

Mrs. Denise Jolis, wife of Lawrence M.
Polizzi and Lawrence M. Polizzi,
Plaintiffs,

v.

MARYLAND CASUALTY COMPANY,
Defendant and Third Party Plaintiff
(Charles L. Oakley, Eugene A. Murphy
and Hartford Accident and Indemnity
Company, Third Party Defendants).

Civ. A. 1459, 1468–1471.

United States District Court
E. D. Louisiana, Baton Rouge Division.

Dec. 14, 1956.

Durrett & Hardin, Baton Rouge, La., for Richard E. Butler, Sr., et al.

Kizer, Heaton, Craig & Cangelosi, Baton Rouge, La., for George A. Brancato and Daniel V. Orsak.

Tolmas & Tolmas and A. P. Schiro, III, New Orleans, La., for Mrs. Clara Louise Scott, et al., and Mrs. Denise Jolis, et al.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for Maryland Cas. Co.

Charles H. Dameron, Baton Rouge, La., for Charles L. Oakley.

Percy, Macmurdo & Avant, Baton Rouge, La., for Hartford Acc. & Indem. Co. and Eugene A. Murphy.

J. SKELLY WRIGHT, District Judge.

These damage suits have all been compromised. There remains for adjudication only the counterclaim of the third party defendant, Charles L. Oakley, against the Maryland Casualty Company for attorneys' fees expended by him in the defense of these actions as well as parallel actions filed in the state court.

Oakley was a student at Louisiana State University. At the suggestion of his instructor, his class in Administrative Procedures decided to make a field trip from the University grounds in Baton Rouge, Louisiana, to St. Francisville, Louisiana, to observe the work at a high school in that city. The class was transported on the field trip in cars owned by the students. Each student using his car, to convey himself as well as other students, was promised and did receive from the University $6 for expenses. On the trip the car driven by Oakley was in a collision which resulted in two deaths and several personal injuries, all of which gave rise to the litigation out of which this claim for attorneys' fees grew.[1]

1. The facts are accurately outlined in more detail in Maryland's brief as follows:

"During the Fall semester of the school year 1953–54 Dr. J. W. Kistler, the Head of the Department of Health & Physical Education at L. S. U., taught a senior course in administrative procedures denominated H & P E 198. There were some 22 students in the class. Near the end of the semester (the course was a one semester course), and just prior to the Christmas holidays, Dr. Kistler brought up with his class the subject of a field trip to a high school in a nearby community for the purpose of observing the work at such school, which he felt would be valuable in connection with the course of study taken by the class. The matter was discussed, and with some possible influencing by Dr. Kistler who was enthusiastic about the idea, it was decided that such a field trip would be made. After the Christmas vacation and early in January of 1954 the matter was again discussed and Dr. Kistler made arrangements for the class to visit the high school at St. Francisville, Louisiana on Friday, January 15. In the two class meetings just prior to that date Dr. Kistler asked for volunteers who could take their automobiles in order to transport the class. In asking for such volunteers, Dr. Kistler advised that he thought he could arrange for some reimbursement of the expenses of such trip from the travel budget of his department. No specific announcement or arrangement was made with regard to the method of such reimbursement or the amount of it. From those students in the class volunteering Dr. Kistler selected several

In the damage suits filed in the state court, Oakley and the Maryland Casualty Company were made defendants, the Maryland Casualty Company on the theory that it was the insurer of Oakley because it had issued a liability policy to

students who volunteered to drive their cars to take the remainder of the class to St. Francisville on January 15.

"Although some effort was made to assign the members of the class to the various automobiles making the trip, such efforts were soon abandoned and the students were instructed to make their own arrangements to go with any of the various students taking their cars. Dr. Kistler also planned to drive his own automobile. Arrangements were made for the class to meet near the classroom in the Gym Armory Building on the L. S. U. campus prior to departure on the morning in question in order that it could be ascertained that everyone had a ride. Two of the students, for personal reasons, desired to take their own cars as they had to return early due to other arrangements or commitments that they had. In all, five student automobiles and Dr. Kistler's car made the trip, carrying the 19 students out of the class who made the trip. Dr. Kistler advised that when he arrived at the Gym Armory all of the cars but two had either already departed or had gotten their loads and had left directly without meeting at the area near the classroom. No attempt was made to travel convoy style or anything resembling it, and the class all met at the St. Francisville High School where the day was spent in observing various activities there.

"Following the close of the school day at St. Francisville, the group started back by the same means that they had left Baton Rouge, with the exception that Dr. Kistler took in his automobile some students who had ridden up with one of the other students in the student's automobile, the latter not planning to return to the campus. Again, no attempt was made to travel convoy style and no specific instructions or directions were given with the exception of the route, which was designated as by way of Jackson and through Baker and Zachary rather than down Highway 61 which was under construction at the time. The class was not to reassemble after arriving in Baton Rouge, but was dismissed and the students were to return to their homes or wherever they wished after returning to the city.

"On the return trip one of the student automobiles operated by Charles Oakley was involved in a very serious accident while attempting to pass one of the other student operated automobiles owned and

driven by Gene Murphy while meeting a third automobile headed in the opposite direction and occupied by Mr. and Mrs. Butler. In the resulting accident, Oakley and two of the passengers in his car were seriously injured, two girl passengers in his car received fatal injuries, and Mr. and Mrs. Butler in the vehicle approaching from the opposite direction were also seriously injured. All of the present suits resulted from these various injuries and the deaths of the two young ladies.

"After returning from the trip Dr. Kistler and three of the students who had taken cars (including Oakley) received, after execution of routine travel voucher form, payments of $6 as reimbursement for automobile expense. The other two students who had driven their automobiles were not so paid (presumably because of their personal reasons for taking their cars and returning separately and alone).

"It subsequently developed that of the six cars making the trip four were definitely owned and registered in the name of the person who offered and drove the vehicles. We have been unable to discover the status as to the fifth, and Oakley's car was registered and titled in his Mother's name. The various statements and depositions reveal, and, in fact, Oakley states in the brief filed by his attorney that there was actually no discussion of the question of ownership of the vehicles prior to the trip being made. Dr. Kistler's three statements likewise indicate that he made no attempt to ascertain ownership, age or condition, etc., of the vehicles which were offered when he called for volunteers.

"Oakley, through his deposition, indicates that the particular Ford automobile he was driving on the trip and at the time of the accident had been originally owned by his older brother, but had been turned over to his Mother and titled in his Mother's name some time after his brother had been married a year or more prior to the accident. Oakley's home was in Lake Charles, where his parents live and where his wife and (at that time) one child also lived. Apparently, Oakley would return to Lake Charles on practically every week end, and in connection with such would quite frequently be either picked up by his parents or would retain the Ford automobile to return to Baton Rouge after the week end and then to return to Lake Charles the following

L. S. U. covering the drivers of vehicles owned or used by it. The petitions filed in state court [2] specifically alleged that Maryland Casualty Company was the insurer of Oakley and as such was liable with Oakley for damages arising out of the wreck.[3]

Maryland Casualty Company contends that it is not the insurer of Oakley and, consequently, owed him no defense to the personal injury or death actions. Oakley maintains, however, that he was an omnibus insured under the policy issued by Maryland to L. S. U. in that the car operated by him, but owned by his mother, was hired by L. S. U. and that, under the policy, the driver of such hired vehicle was covered except where the driver thereof was the owner of the vehicle or his employee.[4] Oakley also contends that

---

week end. Although neither Oakley nor his roommate, Brancato (one of the plaintiffs), was able to give any definite statement as to the percentage of time that Oakley had the car in Baton Rouge for his use, it is apparent from their depositions that Oakley had the car for one and two week periods of time throughout the school year and up to the time of the accident in question.

"Mention should also be made of the fact that Oakley, in addition to being married and having a child at the time, was over 21 years of age, as were all of the other students whose depositions are in the record. As Dr. Kistler stated, they were a rather mature class as far as undergraduate classes go.

"Additional factual information which will be referred to more pointedly later is to the effect that Oakley received and retained the $6 check for car expense reimbursement from the trip and retained the proceeds, he states with his Mother's permission. He likewise sold the Ford automobile he had been driving to a garage for junk for the sum of $50 some time after the accident, and this, too, he retained, according to his deposition, again with his Mother's permission."

2. Similar suits were filed in both the state and federal courts. In the federal court suits, Oakley was not made a defendant because he, like the plaintiffs, is a resident of Louisiana.

3. The relevant allegations in the petitions are:

"15.

"Prior to and at the time of the accident here sued on, the Maryland was the public liability insurer of L. S. U. insuring L. S. U. against any and all liability because of the negligent maintenance, use and operation of the vehicles being operated by Oakley and Murphy, and each of them, including liability of the nature here asserted, for amounts in excess of the amount herein sued for, which said policy was in full force and effect at the time of the said accident.

"16.

"Alternatively, petitioner alleges that each of the automobiles which Oakley and Murphy was operating was an automobile not owned by or registered in the name of L. S. U. or an executive officer thereof or an employee or an agent of L. S. U. who was granted an operating allowance of any sort for the use of such automobile, but said automobile was either used under a contract in behalf of L. S. U. or loaned to L. S. U. and under the terms of the said liability insurance policy, was a 'hired automobile'; and that by the terms of said policy both Oakley and Murphy, and each of them, while operating the said hired automobiles with the permission of L. S. U. (which each of them was doing at the time of the accident) was insured against any and all liability because of the negligent maintenance, operation or use of each of the said automobiles being driven by each of them, including the liability of the nature here asserted. Petitioner thus alleges that under the facts existing prior to and at the time of the accident, and under the terms of the said policy, the Maryland not only insured L. S. U. but also afforded insurance to the said Oakley and the said Murphy."

4. The policy provisions regarding coverage read:

"III. Definition of Insured

"The unqualified word 'insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile * * * provided the actual use of the automobile is by the named insured or with his permission * * * The insurance with respect to any person or organization other than the named insured does not apply:

* * * * *

"(d) with respect to any hired automobile, to the owner thereof or any employee of such owner;

"3. Automobiles Defined, trailers, two or more automobiles.

"(a) Automobile. Except where stated to the contrary the word 'automobile'

irrespective of actual coverage under the policy, he nevertheless was owed a defense by Maryland since the petitions in the personal injury cases charged that he was the assured of Maryland and the policy issued by Maryland to L. S. U. provides that a defense is owed an insured, named or omnibus, "even if such suit is groundless, false, or fraudulent." [5]

■ It is true that in Louisiana, as elsewhere, the obligation to provide a defense for an assured is determined by the allegations of the petition or complaint, irrespective of the fact that the suit may be entirely groundless.[6] But before that principle applies, it must be shown that the defendant in the personal injury action is in fact an assured, named or omnibus, under the policy. Obviously, the insurer's obligation is not to provide a defense for a stranger merely because the plaintiff alleges that the strange defendant is an assured or alleges facts which, if true, would make him so. Conversely, the insurer may not renege on its obligation to provide a defense, even for an omnibus insured, merely because the allegations in the complaint are groundless. For example, where a person is driving the named insured's car with his permission, the permittee is an omnibus assured under the policy and the insurer owes him a defense when sued even though the charge of negligence against him cannot be proved. On the other hand, if permission was not granted for the use of the car, the user thereof is not entitled to a defense under the policy irrespective of proof of negligence. In short, allegations in the plaintiff's petition cannot create an obligation on the part of the insurer to defend where none previously existed. Unless Oakley is shown to be an assured under the policy, named or omnibus, no obligation whatever as to him arises, either as a party to the insurance contract or as the beneficiary of a stipulation therein pour autrui. See LSA–C.C. Arts. 1890 and 1902.

■■ Here there is no such showing. Assuming, as Oakley contends, that the Oakley car comes within the policy definition of "hired automobile,"[7] which is in itself a broad assumption, Oakley is excluded from coverage under the policy by Article III(d) which excludes the owner of the hired car or its employee. As shown in National Mutual Ins. Co. v. Liberty Mutual Ins. Co., 90 U.S.App.D. C. 362, 196 F.2d 597, 599, the obvious intent of Article III(d) is to exclude cov-

---

means a land motor vehicle or trailer as follows:
  "(1) Owned automobile—an automobile owned by the named insured;
  "(2) Hired automobile—an automobile used under contract in behalf of, or loaned to, the named insured provided such automobile is not owned by or registered in the name of (a) the named insured or (b) an executive officer thereof or (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile;
  "(3) Non-owned automobile—any other automobile."

5. The policy provision reads:
  "As respects the insurance afforded by the other terms of this policy the company shall:
  "(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; * * *
  "The unqualified word 'insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile * * *"

6. Pennsylvania Railroad Co. v. Travelers Insurance Co., 6 Cir., 226 F.2d 520; Employers' Liability Assur. Corp. v. Youghiogheny & O. Coal Co., 8 Cir., 214 F.2d 418; American Indemnity Co. v. Sears Roebuck & Co., 6 Cir., 195 F.2d 353; Maryland Casualty Co. v. Pearson, 2 Cir., 194 F.2d 284; Lee v. Aetna Casualty & Surety Co., 2 Cir., 178 F.2d 750; Boutwell v. Employers' Liability Assurance Corp., 5 Cir., 175 F.2d 597; Kelly v. United States Fidelity & Guaranty Co., La.App., 76 So.2d 116; Kansas v. Sun Indemnity Co. of New York, La.App., 37 So.2d 621; Sherman v. O'Sullivan, La. App., 164 So. 343.

7. See Note 4.

erage where a vehicle is hired by the named insured with a driver. Obviously, here Oakley, and his car, were in the class excluded from coverage. While it is true that Oakley was neither the registered owner of the car nor the employee of the registered owner, the fact remains, so far as the University knew, Oakley was the owner and dealt with him as such. He was, therefore, the agent of an undisclosed principal. As to the University as well as to its insurer, he was the principal.[8] He was the owner of the car pro hac vice. As such, he was not an assured under the policy and, consequently, Maryland Casualty Company owed him no defense.

Judgment accordingly.

---

8. Restatement, Agency, § 322, reads:
   "An agent purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract."
   See also 2 Am.Jur., Agency, §§ 404, 421.